## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION
## No. 5:08-CV-282-FL

| | |
|---|---|
| THEE DOLLHOUSE PRODUCTIONS ) | |
| N.C., INC., and MICHAEL JOSEPH ) | |
| PETER, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | **ORDER** |
| ) | |
| DAVID FAIRCHILD, HOSPITALITY ) | |
| LICENSING CORPORATION d/b/a THE ) | |
| MEN'S CLUB, and VCG HOLDING ) | |
| CORPORATION, ) | |
| ) | |
| Defendants. ) | |

This matter now is before the court on motion for summary judgment (DE #74) by defendant

VCG Holding Corporation ("VCG"),[1] and various other motions, including defendant's motion to

dismiss for failure to join necessary parties (DE #33), plaintiffs' motion to stay the proceedings

pending arbitration of a related case (DE #77), plaintiffs' motion for leave to file surreply to the

motion for summary judgment (DE #115), and motion to intervene by Barry Sandman ("Sandman")

and Regale, Inc. ("Regale") (DE #120). Also before the court is plaintiffs' challenge to the expert

testimony of Lori A. Wigler (DE #95). The issues raised are ripe for ruling.

---

[1] Defendants David Fairchild ("Fairchild") and Hospitality Licensing Corporation d/b/a The Men's Club
("Men's Club") previously were dismissed with prejudice by stipulation of the parties.

## STATEMENT OF THE CASE

Thee Dollhouse Productions N.C., Inc. ("Dollhouse N.C.") and Michael Joseph Peter ("Peter") brought complaint against VCG, Fairchild, and Men's Club on July 18, 2007, in Texas state court. Plaintiffs allege that VCG, Fairchild, and Men's Club tortiously interfered with a contract between Dollhouse N.C. and Regale, that VCG misappropriated trade secrets and confidential proprietary information belonging to plaintiffs, and that VCG, Fairchild, and Men's Club engaged in a civil conspiracy.

On August 24, 2007, the case was removed to the United States District Court for the Northern District of Texas. After nearly a year of litigation, during which the parties conducted extensive discovery and filed dispositive motions, the case was transferred to the Eastern District of North Carolina pursuant to 28 U.S.C. § 1404(a).[2] Five motions as noted earlier currently are pending before this court.

This case is related to another that was, until recently, before this court.[3] In the related case, Michael Joseph Peter and Thee Dollhouse Productions N.C., Inc. v. Regale, Inc. and Barry Sandman, No. 5:08-CV-255-FL, plaintiffs sought to compel arbitration against Regale and Sandman for disputes arising under the 1992 Agreement. For convenience of reference, the court refers to the above-captioned matter as the "tort case," and to the related case, in which the parties contested only the arbitrability of their dispute, as the "arbitration case." By order in the arbitration case entered March 25, 2009, the court found, for reasons set forth more particularly therein, that Dollhouse N.C.

---

[2] So extensive were the parties' filings in the Northern District of Texas that shortly before transferring the case to this district, the Texas district court judge entered order prohibiting the parties from filing any further motions without leave of court.

[3] The procedural background of the related case is set forth more particularly in order entered in that case March 25, 2009.

2

and Peter did not waive their rights to arbitration against Regale by virtue of their litigation of the tort case. Accordingly, the court granted Peter and Dollhouse N.C.'s motion to compel arbitration against Regale, but denied the motion to compel arbitration against Sandman. The arbitration case now is closed.

## STATEMENT OF UNDISPUTED FACTS

On June 15, 1992, Dollhouse N.C., a Florida corporation, entered into a contract with Regale, a North Carolina corporation, to provide managerial and consulting services to Regale in connection with Regale's operation of an adult nightclub in Raleigh, North Carolina ("the 1992 Agreement"). Dollhouse N.C.'s sole shareholder is Peter, a Florida resident who bills himself as a founder of the upscale adult nightclub industry.[4] Peter is the mark owner of the trademark "Thee Dollhouse." Sandman, a North Carolina resident, is president and ninety-five percent (95%) shareholder of Regale. By its terms, the 1992 Agreement was executed between Regale and Dollhouse N.C.[5]

The 1992 Agreement required Dollhouse N.C. to provide Regale with, among other things, the resources and personnel to attract and hire staff, training and personnel manuals, services of legal counsel with respect to any First Amendment issues, contract forms, and marketing formats. Regale was to pay Dollhouse N.C. a weekly fee of three percent (3%) of gross receipts for these services, and an additional three percent (3%) of gross receipts for use of the "Thee Dollhouse" name, logo, and trademark. This six percent (6%) payment was collectively referred to as the "base fee." In addition to the base fee, the contract provided that beginning with fiscal year 1993, Regale would

---

[4] Plaintiffs proclaim that "[e]very concept and standard contained in the upscale gentlemen's club today was conceived and pioneered by [Peter's] organization," and that Peter has been referred to as "the Godfather" of the industry. (Pl. Resp. to Mot. for Summ. Judg. 3.)

[5] Sandman signed the 1992 Agreement on behalf of Regale, while Peter signed it on behalf of Dollhouse N.C. Peter also signed separately as mark owner of the "Thee Dollhouse" name, trademark, logo, and format.

3

pay Dollhouse N.C. a sum equal to twenty percent (20%) of its operating profits, which would increase to twenty-four-and-one-half percent (24.5%) in fiscal year 1995. These payments were referred to as "incentive payments." The 1992 Agreement contains an arbitration provision, which provides that "[a]ny dispute or controversy between the parties arising from or relating to this Agreement, the Production, the use of the Premises or the relationship between the parties shall be resolved by final and binding arbitration before the American Arbitration Association to be held in the State of North Carolina." (1992 Agreement, Article XIX.A.)

Dollhouse N.C. performed as required under the 1992 Agreement for at least twelve months following its execution. Defendant contends, however, that Dollhouse N.C. stopped performing its duties under the contract in 1994, and that the 1992 Agreement was terminated during a meeting between the relevant parties in Raleigh in 1996. At that time, defendant contends, Regale and Peter entered into a new oral licensing agreement by which Regale would pay only for use of the name "Thee Dollhouse" for so long as Regale used it. According to defendant, Regale made its final payment to Dollhouse N.C. under the 1992 Agreement on March 4, 1996, and beginning June 21, 1996, Regale made all payments directly to Peter pursuant to the terms of the new oral licensing agreement. Plaintiffs vigorously dispute this version of events and contend that the 1992 Agreement was never terminated.

In the second half of 2006, Sandman informed Peter that he was interested in selling the Raleigh business. The parties dispute the exact nature of the conversation, but it is undisputed that Sandman and Peter reached no agreement regarding a sale between them.

VCG is a consolidator and operator of adult nightclubs in the United States. VCG sought to expand its business by acquiring successful, pre-existing nightclubs. VCG contracts with various

4

individuals to locate businesses for sale which are not otherwise publicly known and of which VCG would otherwise be unaware. VCG had one such commission contract with North Carolina resident David Baucom ("Baucom").

VCG learned, through Baucom, of the opportunity to acquire Regale's Raleigh assets in late 2006 or early 2007. In January 2007, Baucom facilitated a meeting between Michael Ocello, the president of VCG, and Sandman to discuss VCG's possible acquisition of Regale's assets. Officers of VCG and Regale met twice more during early 2007, and during one such meeting, the parties mentioned and discussed the 1992 Agreement.

On March 23, 2007, VCG, acting via its North Carolina subsidiary, Raleigh Restaurant Concepts, Inc. ("RRC"), entered into a formal purchase agreement with Regale whereby RRC agreed to acquire certain of Regale's assets. On April 16, 2007, Regale and RRC closed on the transaction set forth in the purchase agreement. Pursuant to the purchase agreement, RRC acquired substantially all of Regale's assets necessary to operate the adult nightclub in Raleigh, including all fixtures and personal property located on the business premises; all food and beverage supplies; certain contracts and contract rights; all improvements on the premises; all patents, software and software license agreements; computers and other equipment; all licenses; and any other asset not specifically excluded. Among assets specifically excluded was the 1992 Agreement.

Also pursuant to the purchase agreement, VCG, RRC, and Regale executed an indemnification agreement, whereby VCG and RRC agreed to hold harmless, indemnify, and defend Regale, its affiliates, shareholders, and officers against any losses suffered, incurred, or paid in connection with the 1992 Agreement, an unrelated lawsuit pending at that time, and certain other liabilities assumed by VCG and RRC. After closing, Regale sent plaintiffs a letter purporting to

5

terminate any agreements between them. VCG has not used the "Thee Dollhouse" name in its operation of the club.

## DISCUSSION

### A. Motion to Stay

Plaintiffs move the court to stay this litigation pending the outcome of the arbitration in the related case, which this court recently compelled. The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, governs the rights and responsibilities of the parties with respect to an arbitration agreement. Patten Grading & Paving, Inc. v. Skanska USA Bldg., Inc., 380 F.3d 200, 204 (4th Cir. 2004). The FAA provides, in pertinent part, that:

> [i]f any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3. "The plain words of the Act . . . suggest that arbitrability is to be determined on an issue-by-issue basis, without regard to the way that the issues are grouped into claims." Summer Rain v. Donning Co./Publishers, Inc., 964 F.2d 1455, 1461 (4th Cir. 1992). This court recently held that plaintiffs did not default their rights to arbitration under the 1992 Agreement through their litigation of this case. The only question for the court to decide here is whether the current litigation against a non-signatory to the arbitration agreement requires decision on issues referable to arbitration, and should be stayed.

To prevail in their claim of tortious interference with the 1992 Agreement against defendant, plaintiffs must prove, *inter alia*, that the 1992 Agreement was still in effect at the time of VCG's

6

alleged interference, and that Regale breached the 1992 Agreement by selling its assets to VCG's North Carolina subsidiary. These are the very issues subject to arbitration between plaintiffs and Regale. Arbitrability is to be determined on an issue-by-issue basis, however, and, as revealed below, the court resolves the claim for tortious interference without reaching the merits of the contract dispute subject to arbitration between plaintiffs and Regale. Furthermore, the claim for misappropriation of trade secrets involves no issues referable to arbitration. Because the court's decision on the pending motions does not reach any issue referable to arbitration, a stay is not necessary.

The unique procedural posture of this case, including its transfer to this district after extensive litigation, also militates against a stay. The parties have completed voluminous discovery and dispositive motions are ripe. The court finds that further prolonging the litigation would cause inefficiency and undue hardship to defendant. Accordingly, plaintiffs' motion to stay this litigation, pending the outcome of arbitration in the related case, is denied.

**B. Motion for Leave to File Surreply**

Also pending before the court is plaintiffs' motion for leave to file surreply to defendant's motion for summary judgment (DE #115). The court, in its discretion, allows the motion and considers plaintiffs' surreply, lodged on the docket as Exhibit A to plaintiffs' motion for leave to file, in making its determination on the summary judgment motion.

**C. Motion for Summary Judgment**

1. Standard of Review

Summary judgment is appropriate, under Rule 56(c), "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material

7

fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is material if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the court construes evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmovant's favor. Anderson, 477 U.S. at 255.

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting FED. R. CIV. P. 56(e)).

2. Choice of Law

The parties disagree as to which state's law the court should apply. Typically, a federal court sitting in diversity must apply the choice of law rules of the forum state, which, in this case, is North Carolina. See Silvestri v. General Motors Corp., 210 F.3d 240, 243 (4th Cir. 2000). However, plaintiffs chose initially to file their complaint in Texas state court. After defendants removed the case to federal court, and after plaintiffs eventually withdrew their opposition to transfer, the case was transferred to this district for the convenience of the parties and witnesses pursuant to 28 U.S.C. § 1404(a). In this context, the court must apply the choice of law rules of the forum in which plaintiffs chose to file their action, provided that forum was an appropriate forum in which to file.[6]

---

[6] Plaintiffs initially named as defendants two Texas residents who have since been dismissed from the litigation. Accordingly, the court finds that Texas was an appropriate forum in which to file the action originally.

8

See Van Dusen v. Barrack, 376 U.S. 612, 639 (1964) ("[W]here the defendants seek transfer, the transferee district court must be obligated to apply the state law that would have been applied if there had been no change of venue. A change of venue under § 1404(a) generally should be, with respect to state law, but a change of courtrooms."); Myelle v. Am. Cyanamid Co., 57 F.3d 411, 413 (4th Cir. 1995) (citing Van Dusen for principle that "the transferee district court must under § 1404(a) apply the laws of the State of the transferor district court," and that "the laws of the transferor State to be applied by the transferee court include the transferor's choice-of-law rules" (citations omitted)); Merlo v. United Way of Am., 43 F.3d 96, 102 (4th Cir. 1994) ("As a transferee court, the district court was required to apply the [choice of law rules that] would have been applied by the transferor court."). Accordingly, this court will apply the choice of law rules of Texas to determine which state's substantive law to apply.

For cases sounding in tort, such as this one, Texas applies the "most significant relationship" test from the Restatement (Second) of Conflicts, §§ 6 and 145, to determine choice of law. Jelec USA, Inc. v. Safety Controls, Inc., 498 F. Supp. 2d 945, 947 (S.D. Tex. 2007); Thomas v. N.A. Chase Manhattan Bank, 994 F.2d 236, 241 (5th Cir. 1993); Gutierrez v. Collins, 583 S.W.2d 312, 318-19 (Tex. 1979). Under the most significant relationship test, the court must first determine whether the substantive laws of the various jurisdictions conflict. "If the laws do not conflict, there is no need to resolve the choice of law problem." Jelec USA, 498 F. Supp. 2d at 948 (quoting Vanderbilt Mortgage & Fin., Inc. v. Posey, 146 S.W.3d 302, 313 (Tex. App. 2004)). In this case,

plaintiffs assert two primary causes of action: (1) tortious interference with a contract; and (2) misappropriation of trade secrets.[7] The court discusses each in turn.

To prevail on a claim for tortious interference with a contract under Texas law, a plaintiff must prove (1) that a contract subject to interference exists; (2) that the alleged act of interference was willful and intentional; (3) that the willful and intentional act proximately caused the plaintiff's injury; and (4) that actual damage or loss occurred. Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc., 29 S.W.3d 74, 77 (Tex. 2000). "Also, as an affirmative defense, a defendant may negate liability on the ground that its conduct was privileged or justified." Id. at 78. The law of North Carolina differs in one material respect. Under North Carolina law, that a defendant acted without justification in interfering with the contract is a necessary element to the cause of action, and not merely an affirmative defense. See, e.g., United Labs., Inc. v. Kuykendall, 370 S.E.2d 375, 387 (N.C. 1988). The laws of Texas and North Carolina thus differ on the necessary elements of the tortious interference claim.

The court has also reviewed the North Carolina and Texas law applicable to plaintiffs' claim for misappropriation of trade secrets and finds that there are material differences of law. For example, the North Carolina statutory framework requires that, in order to qualify as a trade secret, the information be "subject of efforts that are reasonable under the circumstances to maintain its secrecy." N.C. Gen. Stat. § 66-152(3). Under Texas law, by contrast, efforts to maintain secrecy are merely a factor in determining whether the item can be considered a protected trade secret. See T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc., 965 S.W.2d 18, 22 (Tex. App. 1998).

---

[7] The complaint also alleges civil conspiracy against VCG, Fairchild, and Men's Club. That claim now is moot, as plaintiffs acknowledge, because only VCG remains as a defendant.

10

Although the laws of North Carolina and Texas are admittedly similar as to this cause of action, given the manifest differences between North Carolina's statutory approach and Texas' common law, the court finds that there is a conflict and will embark on a full choice of law analysis to determine which state's law should apply. See Jelec USA, 498 F. Supp. 2d at 948-49.

Having found a conflict between Texas law and North Carolina law on the claims asserted by plaintiffs, the court must next determine which state has the most significant relationship to the occurrence and the parties. Id. at 949-50; RESTATEMENT (SECOND) ON CONFLICT OF LAWS § 145. Section 6 of the Restatement sets forth the general principles the court must consider in its inquiry, and by which the more specific rules are to be applied. These include:

> (a) [T]he needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability and uniformity of result; and (g) ease in the determination and application of the law to be applied.

RESTATEMENT (SECOND) ON CONFLICT OF LAWS § 6; see also GJP, Inc. v. Ghosh, 251 S.W.3d 854, 884 (Tex. App. 2008) (applying the Section 6 factors before reaching the more specific rules); Jelec USA, 498 F. Supp. 2d at 949-50 (same); Gutierrez, 583 S.W.2d at 318-19 (same). The court considers "the qualitative nature of the particular contacts" with a state, and the "state policies underlying the particular substantive issue." Duncan v. Cessna Aircraft Co., 665 S.W.2d 414, 421 (Tex. 1984).

For cases sounding in tort, the court must take into account the following contacts in applying the principles of Section 6: "(a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicil, residence, nationality, place of incorporation

11

and place of business of the parties, and; (d) the place where the relationship, if any, between the parties is centered." RESTATEMENT (SECOND) ON CONFLICT OF LAWS § 145(2). These contacts are to be evaluated according to their relative importance with respect to the particular issue. Id. Section 156 provides guidance as to the relative importance of the four factors set forth in Section 145, and "emphasizes, but does not mandate, the choice of state substantive law with the greatest connection to the injury plaintiff seeks to remedy."[8] Jelec USA, 498 F. Supp. 2d at 952; see also CPS Int'l, Inc. v. Dresser Indus., Inc., 911 S.W.2d 18, 29 (Tex. App. 1995) ("[Section 156 of] the Restatement reveals an emphasis on the situs of the injury, at least with respect to the application of Section 145.")

Applying these principles, the court finds that North Carolina has the most significant relationship to this action. All of the conduct causing plaintiffs' alleged injuries occurred in North Carolina. The relevant negotiations between VCG and Regale occurred in North Carolina and were related to the sale of a North Carolina corporation principally owned by a North Carolina resident. The alleged trade secrets plaintiffs argue were misappropriated were located in North Carolina. The 1992 Agreement underlying this dispute was executed in Raleigh, contains a choice of law provision which selects North Carolina law as the law governing the contract, and requires arbitration of disputes in North Carolina. Plaintiffs, although arguing that Texas law should apply, apparently do not dispute that North Carolina has the most significant relationship to this action,[9] and their

---

[8] Section 156 provides that: "(1) The law selected by application of the rule of § 145 determines whether the actor's conduct was tortious; (2) The applicable law will usually be the local law of the state where the injury occurred." RESTATEMENT (SECOND) ON CONFLICT OF LAWS § 156.

[9] Plaintiffs do not argue that Texas has the most significant relationship to this action, but rather that no choice of law analysis is necessary because no conflict of law exists.

12

complaint highlights the significant extent of the contacts with North Carolina.[10] Furthermore, Texas has virtually no connection to the remaining parties or to the facts and transactions underlying this case. Accordingly, the court will apply North Carolina law to plaintiffs' claims.

3. Tortious Interference with a Contract

Under North Carolina law, the elements of tortious interference with a contract are: (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) defendant's knowledge of the contract; (3) defendant's intentional inducement of the third person not to perform the contract; (4) defendant's acting without justification; and (5) actual damage to plaintiff. Kuykendall, 370 S.E.2d at 387. Plaintiffs assert that VCG tortiously interfered with the 1992 Agreement between Dollhouse N.C. and Regale when VCG, acting via its subsidiary, RRC, purchased Regale's assets. For purposes of this order, the court will assume without deciding that the 1992 Agreement was valid and enforceable at the time of the alleged interference, that Regale breached the 1992 Agreement by selling its assets to VCG, and that VCG intentionally induced Regale to sell its assets in breach of the contract. Even under these assumptions, however, summary judgment must be granted in favor of VCG because the undisputed facts show that VCG did not act without justification.

---

[10] The complaint alleges: "As an enticement for VCG to acquire his enterprise, and to show the value of his expertise in the North Carolina market, Defendant Fairchild spearheaded the takeover by VCG and Men's Club of the Raleigh-Dollhouse. This had the effect of creating a cluster in North Carolina as desired by VCG to capitalize on the goodwill established by Charlotte-Men's Club. By working together in Raleigh and Charlotte, Men's Club and VCG sought to and did eliminate the Raleigh-Dollhouse, the only real competition to Charlotte-Men's Club, and capture the North Carolina market . . ." (Complaint ¶ 16.)

13

As a general matter, "interference with contract is justified if it is motivated by a legitimate business purpose, as when the plaintiff and the defendant, an outsider, are competitors."[11] Embree Const. Group, Inc. v. Rafcor, Inc., 411 S.E.2d 916, 924 (N.C. 1992). To determine whether a defendant's conduct is justified, courts consider "the circumstances surrounding the interference, the actor's motive or conduct, the interests sought to be advanced, the social interest in protecting the freedom of action of the actor and the contractual interests of the other party." Peoples Sec. Life Ins. Co. v. Hooks, 367 S.E.2d 647, 650 (N.C. 1988) (citing 4 RESTATEMENT (SECOND) OF TORTS § 767 (1979)). The privilege to interfere with a contract "is conditional or qualified; that is, it is lost if exercised for a wrong purpose." Smith v. Ford Motor Co., 221 S.E.2d 282, 294 (N.C. 1976) (quoting Carpenter, *Interference with Contract Relations*, 41 HARV. L. REV. 728, 746 (1928)). "[A] wrong purpose exists where the act is done other than as a reasonable and *bona fide* attempt to protect the interest of the defendant which is involved." Id. If a defendant acts for a "legitimate business purpose, his actions are privileged." Hooks, 367 S.E.2d at 650. Indeed, "[n]umerous authorities have recognized that competition in business constitutes justifiable interference in another's business relations and is not actionable so long as it is carried on in furtherance of one's own interests and by means that are lawful." Id.

Construing the evidence in plaintiffs' favor, the court finds no indication that VCG acted out of anything other than its legitimate business interests in acquiring Regale's assets. It is undisputed

[11] Plaintiffs deny being VCG's competitors. Dollhouse N.C. has no assets other than the 1992 Agreement and provides only the services set forth therein. Dollhouse N.C. is solely owned by Peter, however, who admits to being a nationwide owner and operator of adult nightclubs. (Peter Decl. ¶ 3.) Indeed, as plaintiffs state in their response brief, "[o]ver the years the [Michael Peter organizations] [have] built, opened and had direct ownership and/or ha[ve] provided management or consulting services for over one hundred gentlemen's clubs in the United States and around the world." (Pl. Resp. to Mot. for Summ. Judg. 3 n.2.) As such, the court finds that plaintiffs and VCG are competitors in the national adult nightclub industry.

14

that VCG paid $10,200,000.00 in cash and common stock to purchase the assets. Prior to closing on the purchase, VCG issued a press release noting that the acquisition was "highly accretive," would add "another premier club to our upscale portfolio of clubs," and would allow the company to meet or exceed its previously released earnings guidance for 2007, 2008, and 2009. After closing on the purchase agreement, VCG issued another press release, adding that the "Raleigh location will contribute $6,450,000.00 in gross revenue and $3,000,000.00 in pretax cash flow annually." Thus, by purchasing Regale's assets, VCG sought to expand its portfolio of adult nightclubs, meet or exceed its earnings guidance, increase revenue, and improve cash flow. All of these are legitimate business purposes. Indeed, it is difficult to imagine that a publicly traded corporation would spend in excess of $10,000,000.00 to acquire assets of another company if doing so were not deemed in the corporation's business interests.

Plaintiffs argue that merely profiting from a deal is insufficient to justify interference with a contract, but plaintiffs have failed to demonstrate how purchasing assets from a willing seller was unlawful under these circumstances. The crux of plaintiffs' argument seems to be that because VCG was not a party to the 1992 Agreement and had no legal rights stemming therefrom, any act of interference with the 1992 Agreement by VCG was unjustified. Under North Carolina law, however, a defendant may interfere with a contract between other parties if it does so for a legitimate business purpose. See, e.g., Hooks, 367 S.E.2d at 650. Such a legitimate business purpose was present here.

That VCG knew of the 1992 Agreement before purchasing Regale's assets and agreed to indemnify Regale for any liability it might incur as a result of the 1992 Agreement does not alter the court's analysis. Regale demanded indemnity as part of the purchase agreement, and plaintiffs have presented no evidence that the indemnification agreement was somehow unlawful or indicative of

15

legal malice by VCG. Needless to say, there are many reasons why a corporation selling substantially all of its assets may seek to secure indemnity against future liabilities before entering a purchase agreement.

Plaintiffs' attempt to demonstrate that VCG acted with actual malice in its acquisition of Regale's assets fails as well. North Carolina law distinguishes between legal malice, which demonstrates a lack of justification in a tortious interference action, and actual malice, which, by itself, does not. See Reichhold Chems., Inc. v. Goel, 555 S.E.2d 281, 288-89 (N.C. Ct. App. 2001). As the North Carolina Supreme Court has stated:

> There are frequent expressions in judicial opinions to the effect that malice is requisite to liability in an action for inducing a breach of contract . . . The term "malice" is used in this connection in its legal sense, and denotes the intentional doing of the harmful act without legal justification. Indeed, actual malice and freedom from liability for this tort may coexist. If the outsider has a sufficient lawful reason for inducing the breach of contract, he is exempt from liability for so doing, no matter how malicious in actuality his conduct may be . . . Notwithstanding it is not an element of the cause of action, actual malice may negative the existence of justification in a particular case. This is true because the outsider is never justified in inducing a breach of contract solely for the purpose of visiting his personal hatred, ill will, or spite upon the plaintiff.

Childress v. Abeles, 84 S.E.2d 176, 182 (N.C. 1954) (citations omitted). Thus, because the court has already found that VCG had a lawful purpose in acquiring Regale's assets, and did not act with legal malice, any alleged actual malice is irrelevant. Nonetheless, the court finds that plaintiffs have presented no evidence of actual malice by VCG. The deposition testimony cited by plaintiffs as evidence of VCG's actual malice merely reveals that VCG's president no longer views Peter as a "major player" in the adult nightclub industry. It is not indicative of any personal hatred, ill will, or spite by VCG. Plaintiffs also assert that VCG wanted to "steal" the Raleigh nightclub from plaintiffs and "use its superior size and strength to bully Mr. Peter out of Raleigh." (Pl. Resp. to Mot. for

16

Summ. Judg. 43.) Plaintiffs did not own the Raleigh nightclub, however, and VCG did not "steal" it from them. Rather, VCG lawfully purchased assets from Regale in furtherance of its business interests.

Because the record is devoid of any evidence suggesting that VCG was motivated by malice, ill-will, or any motive other than a legitimate business interest in acquiring Regale's assets, VCG's motion for summary judgment as to plaintiffs' claim for tortious interference is granted.[12]

4. Misappropriation of Trade Secrets

The court now considers VCG's motion for summary judgment as to plaintiffs' claim for misappropriation of trade secrets. North Carolina's Trade Secrets Protection Act ("the Act"), N.C. Gen. Stat. §§ 66-152 to 66-157, provides that the owner of a trade secret "shall have remedy by civil action for misappropriation" of that secret. N.C. Gen. Stat. § 66-153. "'Misappropriation' means acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret." N.C. Gen. Stat. § 66-152(1). To state a prima facie case, a plaintiff must introduce "substantial evidence that the person against whom relief is sought both: (1) [k]nows or should have known of the trade secret; and (2) [h]as had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner." N.C. Gen. Stat. § 66-155.

Defendant argues that plaintiffs have failed to present evidence showing that they have trade secrets worthy of protection and that VCG misappropriated those trade secrets. The court agrees.

---

[12] The court would have reached the same outcome had it applied Texas law, because VCG has affirmatively demonstrated that it was justified in purchasing Regale's assets.

17

The term "trade secret" is defined under the Act as "business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process" that both "[d]erives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use," and "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." N.C. Gen. Stat. § 66-152(3). The Act further provides that "[t]he existence of a trade secret shall not be negated merely because the information comprising the trade secret has also been developed, used, or owned independently by more than one person, or licensed to other persons." Id.

Although the scope of the purported trade secrets identified by plaintiffs is not entirely clear,[13] plaintiffs seem to point especially to certain nightclub operation manuals and training manuals, including a "Bible of Operations," which were provided to Regale pursuant to the 1992 Agreement. These manuals set forth certain music formats, forms for club membership, and systems for liquor sales, finances, and cash accounting, along with systems relating to the entertainers' performances. Plaintiffs also assert that certain lectures on hospitality and other subjects used to motivate the staff and create ambiance for the "show" were trade secrets.[14]

---

[13] Plaintiffs seem to identify all aspects of the operation of the Raleigh nightclub and the entertainment format presented there as trade secrets proprietary to plaintiffs. As Peter affirmed, "[w]e do things differently from the front door to the back, in the dressing rooms, behind the bar, with the DJ, with the lighting and with the entertainers to create presentation at our clubs that is proprietary." (Peter Decl. ¶ 33.) This purportedly includes the "attitude, hospitality, appearance, costuming, makeup, cosmetics, techniques, quotas, types, profiles thatgo into the club to create a unique production" as well as systems for how entertainers "represented on stage, music, and dress, how they dressed when out in the club and how they performed on stage." (Pl. Resp. to Mot. for Summ. Judg. 47-48.)

[14] Plaintiffs' claims for misappropriation of any additional purported trade secrets must fail because they have failed to identify them with sufficient particularity. See Analog Devices, Inc. v. Michalski, 579 S.E.2d 449, 453 (N.C. Ct. App. 2003) ("It is generally accepted that a plaintiff must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur."); see also VisionAIR, Inc. v. James, 606 S.E.2d 359, 364 (N.C. Ct. App.

18

The threshold question is whether the information allegedly misappropriated by VCG constitutes a trade secret under N.C. Gen. Stat. § 66-152(3). In analyzing what constitutes a trade secret under the Act, North Carolina courts have typically considered six factors: (1) the extent to which the information is known outside the business; (2) the extent to which it is known to employees and others involved in the business; (3) the extent of measures taken to guard secrecy of the information; (4) the value of information to business and its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could properly be acquired or duplicated by others. See Wilmington Star-News, Inc. v. New Hanover Reg'l Med. Center, 480 S.E.2d 53, 56 (N.C. Ct. App. 1997); State ex rel. Utils. Comm'n v. MCI, 514 S.E.2d 276, 282 (N.C. Ct. App. 1999); Area Landscaping, LLC v. Glaxo-Wellcome, Inc., 586 S.E.2d 507, 511 (N.C. Ct. App. 2003); Combs & Assocs., Inc. v. Kennedy, 555 S.E.2d 634, 640 (N.C. Ct. App. 2001).

Summary judgment must be granted in favor of VCG because plaintiffs point to no evidence suggesting that the content of their operations manuals and lectures on hospitality were not generally known or readily ascertainable by someone experienced in the field, or, for that matter, by a customer of the Raleigh nightclub. Rather, the evidence indicates that plaintiffs' purported trade secrets were well known by both Peter's employees and by the employees and independent contractors of Regale and other adult nightclubs with which Peter had licensing and consulting agreements. Although sharing trade secrets with employees or licensees will not, by itself, negate the existence of a trade secret, the evidence indicates that many of Peter's employees were free to share or utilize the

---

2004) (finding plaintiff failed to identify trade secrets with specificity where only "broad product and technology categories" were identified); Washburn v. Yadkin Valley Bank and Trust Co., 660 S.E.2d 577, 585-86 (N.C. Ct. App. 2008) (affirming dismissal of claim where identification of trade secrets was "broad and vague" and allegation of misappropriation was "general and conclusory").

information gleaned from the manuals in subsequent employment. Plaintiffs point to no valid non-competition agreements with former employees, and Peter admits that some of his former managers have been free to use what they learned from their employment with Peter's organizations in their future employment with other adult nightclubs. The record further reflects that none of the employees of the Raleigh nightclub at the time of Regale's asset sale to VCG were employees of plaintiffs; rather, they were all either employees of Regale, or independent contractors. Although they may have been familiar with the content of plaintiffs' manuals, plaintiffs have presented no evidence that they were bound to keep that information confidential.

Plaintiffs allege that the club manuals were locked in the manager's office at the Raleigh location and were not to be removed from the property. While plaintiffs may have taken steps to protect the reproduction of the manuals themselves, it appears their content was widely known and generally ascertainable by anyone familiar with the adult nightclub industry. Furthermore, even assuming that plaintiffs' manuals for club operations qualify as trade secrets under North Carolina law, the record is devoid of evidence that anyone from VCG has seen, acquired, or used those manuals.[15] Plaintiffs assert that Regale has not returned the manuals to plaintiffs since closing on the purchase agreement, but they present no evidence that VCG has acquired them. Rather, the undisputed facts show that prior to surrendering possession of its assets to RRC, Regale, at VCG's instruction, removed any allegedly proprietary information from the nightclub premises, including any books or manuals, along with all materials containing the "Thee Dollhouse" trademark.

---

[15] At deposition, Peter testified as follows:

Q: Sorry about that. We were talking about the manuals a few moments ago and we were talking and you – and you indicated you don't know whether or not – well, you may believe that VCG has used your manuals. You don't know that, true?

A: That they're actively – that they – I don't know that they've reproduced them and that they're using them with their employees there or anywhere else. No, I do not know that. (Peter Dep., December 19, 2007, 140.)

20

Sandman further testified that after removing the manuals from the premises, he disposed of them. Accordingly, summary judgment is proper as to this claim.[16]

## D. Motion to Intervene

Lastly, the court considers the motion to intervene filed by Regale and Sandman, the respondents in the recently decided arbitration case. Regale and Sandman moved to intervene on October 8, 2008, after dispositive motions in this action, denominated the tort case, had become ripe and before the court had ruled on the motion to stay arbitration and the motion to compel arbitration in the arbitration case. Because the court has since ruled that Regale is compelled to arbitrate any dispute with plaintiffs arising from the 1992 Agreement, Regale's motion to intervene as of right as a defendant in this litigation must be denied. Furthermore, as discussed above, the court's decision in this case does not implicate any of the legal questions surrounding the 1992 Agreement that Regale and Sandman argue justify their right to intervene as of right pursuant to Federal Rule of Civil Procedure 24(a). Accordingly, Sandman's motion to intervene is also denied. For the same reason, the court denies Regale and Sandman's motion for permissive intervention pursuant to Federal Rule of Civil Procedure 24(b).

## CONCLUSION

For the reasons set forth above:

1. Plaintiffs' motion for leave to file a surreply (DE #115) is ALLOWED;

2. Defendant's motion for summary judgment (DE #74) is GRANTED;

3. Defendant's motion to dismiss for failure to join necessary parties (DE #33) is DENIED as MOOT;

---

[16] The same result would have been reached under Texas law.

4. Plaintiffs' motion to stay this matter pending arbitration of the contract dispute between plaintiffs and Regale (DE #77) is DENIED; and

5. Motion to intervene by Regale and Sandman (DE #120) is DENIED.

Furthermore, because the court did not consider any expert testimony in its decision on the motion for summary judgment, plaintiffs' motion, styled a "challenge" to the expert testimony of Lori A. Wigler (DE #95), is DENIED as MOOT. The clerk is directed to CLOSE this case.

SO ORDERED, this the 35 day of March, 2009.

LOUISE W. FLANAGAN
Chief United States District Judge